**JENNY L. FOLEY, Ph.D., ESQ.**
Nevada Bar No. 9017
**HKM EMPLOYMENT ATTORNEYS LLP**
1785 East Sahara, Suite 325
Las Vegas, Nevada 89104
Tel:  (702) 625-3893
Fax: (702) 625-3893
E-mail: jfoley@hkm.com
*Attorney for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| LARA WARD , an Individual<br><br>Plaintiffs,<br><br>vs.<br><br>STATE OF NEVADA, ex rel. its BOARD OF MEDICAL EXAMINERS,  DON ANDREAS, an Individual, PAMELA CASTAGNOLA, an Individual, KIM FRIEDMAN, an Individual  KATI PAYTON,  an Individual, TODD RICH, an Individual AND EDWARD COUSINEAU, an Individual; DOES I – X,<br><br>Defendants | CASE NO.:<br><br>**COMPLAINT AND JURY DEMAND** |

The Plaintiff Lara Ward ("Ward") by and through her attorney, Jenny L. Foley, Ph.D., Esq. of HKM Employment Attorneys LLP hereby complains and alleges as follows:

### JURISDICTION

1. This is an action for damages arising under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e to 2000e-17; NRS 613.330(1)), 42 U.S.C. §1983 Equal Protection; and NRS 613.340.

2. This Court has primary jurisdiction over claims set forth herein pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. §1343(a) (4) (civil rights action) and 42 U.S.C.

§2000e-5(f) (3) (unlawful discrimination and retaliation in employment).  Additionally this Court has supplemental jurisdiction over any state law claims pled herein pursuant to 28 U.S.C. §1367.

3.   Upon information and belief, all material allegations relative to the named defendants contained in this Complaint occurred in the State of Nevada, Clark County.  Therefore, venue properly lies in the southern division of the United States Court for the District of Nevada pursuant to 28 U.S.C. §1391(b)(2).

4.   At all relevant times, Defendant, State of Nevada employed 20 or more employees for each working day during each of the 20 or more calendar workweeks in the current or preceding calendar year, and are therefore subject to the provisions of the statutes outlined herein.

## EXHAUSTION OF ADMINISTRATIVE REMEDY

5.   On or about June 15, 2016, Plaintiff initiated the process of filing a Charge of Discrimination against her employer, the Defendant(s) named in this action with the Equal Employment Opportunity Commission ("EEOC").

6.   On or about November 17, 2016, Ms. Ward received her "Notice of Right to Sue" from the EEOC.

7.   Less than 90 days have passed since the date of mailing of the "Notice of Right to Sue." This action is timely filed pursuant to 42 U.S.C. § 2000e-5(f).

8.   Prior to filing this action, Ms. Ward has exhausted her administrative remedy on all claims pled hereunder.

## GENERAL ALLEGATIONS

9.   Plaintiff incorporates all of the allegations in the preceding paragraphs as though fully set forth herein.

10. Plaintiff Lara Ward is a citizen of the State of Nevada and a resident of Clark County, Nevada.

11. Upon information and belief, Don Andreas is a citizen of the State of Nevada and a resident of Clark County, Nevada.

12. Upon information and belief, Pamela Castagnola, is a citizen of the State of Nevada and a resident of Washoe County, Nevada.

13. Upon information and belief, Kim Friedman is a citizen of the State of Nevada and a resident of Clark County, Nevada.

14. Upon information and belief, Kati Payton is a citizen of the State of Nevada and a resident of Clark County, Nevada.

15. Upon information and belief, Todd Rich is a citizen of the State of Nevada and a resident of Washoe County, Nevada.

16. Upon information and belief, Edward Cousineau is a citizen of the State of Nevada and a resident of Washoe County, Nevada.

17. Defendant is the State of Nevada ex rel. the Board of Medical Examiners.  Ms. Ward is employed as an investigator with the Board of Medical Examiners ("BME") in its Las Vegas office located at 6010 South Rainbow Blvd, Building A, Suite 2, Las Vegas, Nevada 89118.  The BME is headquartered in its Reno office located at Terminal Way, Suite 301, Reno, Nevada 89502.

18. The State of Nevada had over 500 employees at all times relevant to this matter.

### FACTS

19. Edward Cousineau is the Executive Director of the BME and primarily works in the Reno, Nevada office of the BME.

20. Todd Rich, at the relevant times mentioned herein, was the Deputy Executive Director and primarily worked in the Reno, Nevada office of the BME. Upon information and belief, Mr. Rich is no longer employed with the BME.

21. Pamela Castagnola is the Chief of Investigations and primarily works in the Reno, Nevada office of the BME.

22. Don Andreas is the Deputy Chief of Investigations- Las Vegas Office and works in the Las Vegas office of the BME.

23. Mr. Andreas is the immediate supervisor of Plaintiff, Lara Ward as well as Kim Friedman and Kati Payton.

24. Kati Payton is employed as an Investigator with the BME in the Las Vegas office.

25. Kati Payton started at the BME in August 2015, as an administrative assistant in the Las Vegas office.

26. Ms. Payton was promoted to Investigator in the Las Vegas BME office in approximately February 2016, but for unknown reasons continued to work as the administrative assistant for some time thereafter.

27. Upon information and belief, Ms. Payton is not qualified to maintain her position and was never qualified to be promoted to an Investigator position.

28. In February 2016,, the job requirements for the BME Investigator position required a Bachelor's degree.

29. Ms. Payton does not have a Bachelor's degree.

30. Ms. Payton is, by training a veterinary assistant, animal care attendant, and bank teller. She claims to have started a Bachelor's degree program in 2016, at UNLV.

31. Further, in March 2016, the requirements for the Investigator position were reduced to require an Associate's degree instead of a Bachelor's degree.

32. Upon information and belief, Ms. Payton does not have an Associate's degree.

33. Ms. Payton is friendly with, and very loyal to Don Andreas, who was instrumental in ensuring that Ms. Payton was put into the Investigator position, despite her lack of qualifications to hold the position.

34. Kim Friedman is a senior investigator and works in the Las Vegas office of the BME.

35. Ms. Friedman was hired as a part-time administrative assistant for the Las Vegas office of the BME in approximately 2012. Thereafter, she was given a full-time position as the administrative assistant.

36. Ms. Friedman was given the title of Investigator in approximately 2013.

37. In approximately late 2016, Ms. Friedman was given the title of Senior Investigator.

38. Upon information and belief, Ms. Friedman was not qualified to obtain or maintain either the Investigator or Senior Investigator positions.

39. In 2016, the BME Investigator position required a Bachelor's degree.

40. Ms. Friedman does not have a Bachelor's degree, nor did she have any significant investigative experience that would have qualified her to obtain or maintain the position.  Further, Ms. Friedman does not possess an Associate's degree to maintain the Investigator position.

41. Ms. Friedman has a certificate as a medical assistant from Pima Medical Institute, and a Diploma of surgical technologies from Anthem Institute.

42. Upon information and belief, Mr. Andreas was instrumental in ensuring that Ms. Friedman was promoted to Investigator. Further, Mr. Andreas was instrumental in ensuring that Ms. Friedman was promoted to the Senior Investigator position in place of Ms. Ward.

43. Mr. Andreas and/or Ms. Castagnola were instrumental in ensuring that the position postings for the Investigator and/or Senior Investigator positions open in the Las Vegas BME office were never made public as required by Nevada law.

44. Mr. Andreas was instrumental in Ms. Friedman's hiring at the Las Vegas BME office.  Ms. Friedman is very loyal to and friendly with Mr. Andreas, in part because she was promoted several times and eventually put into the Senior Investigator position in the Las Vegas BME office in significant part due to Mr. Andreas' influence; despite her lack of agency listed requirements for education and experience.

45. Upon information and belief, all investigators at the BME have at least a Bachelor's degree, except Ms. Payton and Ms. Friedman.

46. Ms. Ward started working at the BME in the Las Vegas office on or about April 9, 2015, as an Investigator.

47. Ms. Ward has a Bachelor's degree in criminal justice with a minor in Sociology, from the University of Colorado.  Ms. Ward graduated with honors.

48. Ms. Ward also has an Associate's of Applied Science degree in Occupational Therapy.

49. Further, she has numerous certifications, advanced coursework and years of investigative experience.

50. Ms. Ward was required to show proof of her Bachelor's degree upon hire, a requirement which was not imposed on others.

51. Since Ms. Ward was hired in April 2015, she has consistently been a superlative employee. Ms. Ward received a Unit Exemplary Service Award from Sheriff Joseph Lombardo for work associated with the LVMPD Homeland Security Joint Terrorism Task Force Division.

## SEXUAL HARASSMENT

52. In March 2016, Don Andreas sexually harassed Ms. Ward.

53. The sexual harassment began as Ms. Ward assisted Mr. Andreas with an investigation case assigned to Mr. Andreas. Mr. Andreas' poor reputation among law enforcement made his obtaining two critical pieces of information very difficult.

54. Ms. Ward, who even at this early point in her BME career had already established herself as an excellent investigator, was able to obtain the first piece of necessary information due to her previous outstanding work with various federal and local law enforcement agencies.

55. In response to Ms. Ward's assistance in obtaining the first piece of information, he needed for the investigation, Mr. Andreas inquired, *"Who did you have to blow to get that?"*

56. Ms. Ward strongly objected to Mr. Andreas' question and told him that it was inappropriate and highly unwelcome.

57. A few weeks later, when Ms. Ward obtained the second piece of information, Mr. Andreas again asked Ms. Ward *"who did you blow to get it?"* or words indicating that Ms. Ward had performed oral sex in exchange for the information.

58. Ms. Ward strongly and pointedly objected to Mr. Andreas' comment and insisted that he refrain from making further such comments.

**THE RETALIATION BEGINS**

59. After Ms. Ward complained to Mr. Andreas about his inappropriate comments the second time, Mr. Andreas' attitude toward Ms. Ward changed dramatically for the worse.

60. Mr. Andreas began to engage in and encourage and support a pattern of retaliation, disparagement and disparate treatment towards Ms. Ward that continues to the present day and grew to include Ms. Castagnola, Ms. Payton and Ms. Friedman.

**MS. WARD IS WRITTEN UP FOR PURSUING AND THEN DENIED PROMOTION IN RETALIATION FOR RESISTING MR. ANDREAS' SEXUAL HARASSMENT**

61. Shortly after Ms. Ward complained to Mr. Andreas about his inappropriate comments, she expressed strong interest in a recently announced Senior Investigator position at the Las Vegas BME office to Ms. Castagnola, Mr. Cousineau and Mr. Rich via email.

62. On or about March 9, 2017, Ms. Castagnola responded to Ms. Ward's email stating that although the position posting did not require three years of BME experience, Ms. Castagnola required three years of BME experience.

63. The position posting dated 03/16 stated that the Senior Investigator position required a "Bachelor's degree, in Criminal Justice, Government, Health Care or related appropriate field strongly preferred; Associate's Degree required."

64. Further, the position posting dated 03/16 required "Three (3) years investigative experience, or appropriate claims examiner experience with experience in interviewing or any combination acceptable to the Board."

65. Thereafter, Ms. Castagnola, in person at the Las Vegas BME office, berated Ms. Ward for having the temerity to express interest in the senior investigator position.

66. Ms. Ward believes that this verbal dressing down was at the instigation of Mr. Andreas.

67. As a consequence of Ms. Ward's expressing interest in the Senior Investigator position, Ms. Castagnola scored Ms. Ward poorly on her next employee review in October, 2016.

68. Ms. Castagnola gave Ms. Ward a score of of "Needs Improvement" on her

"Collaboration" skills in the October 2016, and admonished her for expressing desire to be promoted to a higher classification. The poor score and admonishment were due to Ms. Ward expressing interest in the position.

69. Ms. Ward tried to persevere and endure the constant harassment and retaliation by Mr. Andreas without complaining to Mr. Andreas' supervisors or executive management in the hope that the behavior would cease. However, Ms. Ward's attempt to deal with the retaliation on her own proved futile.

70. After months of enduring excruciating psychological abuse, disparate treatment, and ongoing harassment, Ms. Ward finally reported the sexual harassment and retaliation to Mr. Cousineau and Mr. Rich who, at that time, was the BME's Deputy Executive Director.

71. During the conversation, Ms. Ward also relayed to Mr. Rich a number of improprieties that were ongoing in the BEM Las Vegas office, which are outlined below.

## MS. WARD REPORTS VARIOUS INSTANCES OF IMPROPER BEHAVIOR AND THE RETALIATION ESCALATES

72. During the conversation mentioned above with Mr. Rich, Ms. Ward relayed various instances of improper conduct and improprieties including, but not limited to:

   a. Mr. Andreas deliberately targeting a specific physician due to personal animus, despite another governmental agency finding no fault or issue with the complaints lodged against the physician. When Ms. Ward requested administrative closure of the case, Mr. Andreas replied "*No, Dr. ***** is a prick, send the letter. If it was anybody else we would close the case.*" This incident was particularly disturbing because counsel for that physician had already accused the BME, Mr. Andreas and Ms. Ward in particular of holding a grudge against the physician. Ms. Ward then requested to speak with Ms. Castagnola regarding the closure issue and was told by Mr. Andreas that she was not permitted to do so;

   b. Mr. Andreas and Ms. Friedman discussing confidential information in meetings

with insurance company investigators and attorneys, as well as state and federal investigators both in person and via telephone;

c. Mr. Andreas providing an insurance representative with certain physicians travel dates;

d. A cover up regarding a box full of case files shipped from the BME's Reno office to the BME's Las Vegas office that disappeared when Ms. Payton signed for the box;

e. The lack of qualifications of Ms. Payton and Ms. Friedman and their adoration and support of Mr. Andreas, to the detriment of the BME's mission;

f. Mr. Andreas insistence that a Respiratory Therapist/Licensee's girlfriend be served confidential legal documents while she worked as a nurse at a local hospital, despite the impropriety of doing so;

g. Inappropriately listing Limited Liability Corporations or Corporations on complaint letters, despite Ms. Ward's protests to the contrary, and ordering Ms. Ward do the same;

h. Mr.Cousineau improperly administratively closing high profile cases where malpractice is found in order to cover incompetence;

i. Ms. Castagnola improperly administratively closing BME investigative cases;

j. Mr. Andreas negligently advising federal law enforcement officials that certain opiod overdose deaths were "bad" due to Mr. Andreas' mistaken and/or incompetent reading of toxicology reports or panels.  Ms. Ward also informed Mr. Rich and Mr. Cousineau of Mr. Andreas' admission that the aforementioned had happened 'hundreds' of times over the course of Mr. Andreas' career with the BME.

k. Mr. Andreas' boasting that he had preliminarily removed "hundreds" of patient files and/or investigative files from physician/peer review due to his mistaken/incompetent reading of toxicology or other laboratory reports;

l. Mr. Andreas administratively closing a variety of high profile "overdose" cases,

1    including some which involved the death of the patient because he misread the

2    lab reporting;

3    m.  A suspicious general refusal to investigate certain physicians, many of whom

4    had long and impressive complaint histories, including deaths, when these

5    certain physicians and/or their representatives had made allegations that Mr.

6    Andreas and/or Mr. Cousineau had taken bribes;

7    n.  Significant and inexplicable delay in handling of opioid/over prescription

8    investigations, including some which resulted in death;

9    o.  Mr. Andreas' repeated mention to Ms. Ward that Ms. Castagnola "hated" Ms.

10   Ward and that Ms. Castagnola "holds [a] grudge" against Ms. Ward for reporting

11   inappropriate behavior concerning Mr. Andreas, Ms. Castagnola, Ms. Friedman

12   and Ms. Payton to BME Executive management.

13   p.  Mr. Andreas' bragging that he "always holds a grudge" and "never forgets" and

14   will always "get even."

15   q.  Mr. Andreas lying to his BME supervisors regarding BME case handling;

16   r.  Misplaced complaints from government agencies;

17   s.  Ms. Friedman's  and Mr. Andreas' insistence that certain physicians need to be

18   "put in their place"  as well as performing on-site investigations where a BME

19   licensee is not involved, despite the potential liability this may subject the BME

20   to due to lack of jurisdiction;

21   t.  Mr. Andreas reeking of alcohol often in the office, and his claim to have been

22   arrested in Washoe County, Nevada for public intoxication.  Upon information

23   and belief, Mr. Andreas failed to report this arrest to his BME superiors;

24   u.  That Mr. Andreas has claimed to have a series of 'damming' letters and emails

25   from Ms. Castagnola some of which include Ms. Castagnola referring to certain

26   persons using the "N-word."

27   v.  Mr. Cousineau administratively closing high profile cases where evidence of

28   malpractice had been found;

w.  A number of Nevada physicians complaints of fraud and alleging bribery related to Mr. Andreas and Mr. Cousineau;

x.  Ms. Castagnola improperly administratively closing BME investigations/cases to cover up malpractice, incompetence and/or to protect Mr. Andreas and/or Mr. Cousineau;

y.  Ms. Castagnola and Mr. Cousineau deliberately stalling or otherwise delaying the progression of numerous of Ms. Ward's opioid prescription cases, for up to a year, where malpractice has been found despite Nevada's opioid epidemic. The BME cases improperly administratively closed also involve the misuse of cervical/spinal cord injections associated with motor vehicle accidents. Ms. Ward discovered what appeared to be a connection regarding fraud associated with personal injury attorneys working with certain physicians, who would take patients on "attorney liens" and perform dangerous, and expensive invasive procedures for financial gain. The aforementioned was reported to Mr. Andreas, Ms. Castagnola and Mr. Rich. The doctors involved in these matters were represented primarily by one local Las Vegas attorney, and were being sued by a major insurance company for fraud. The cases were administratively closed due to Mr.Andreas ordering Ms. Ward to share a public document with the attorney at issue. Ms. Ward was later reprimanded for following this instruction; and

z.  Premature closing of several high-profile prescribing cases with allegations associated with medical practitioners over-prescribing opiods to patients.

73. Mr. Rich stated to Ms. Ward that he would investigate the sexual harassment, retaliation and other issues.

74. Ms. Ward is aware that some or all of these issues were brought to the attention of Mr. Cousineau, because Mr. Cousineau, in person, threatened Ms. Ward's job for reporting the information, stating that if she "didn't like it" she could "go look for another job."

75. Thereafter, the retaliation continued, escalated and did not stop.

## THE RETALIATION ESCALATES AFTER MS. WARD REPORTS SEXUAL HARASSMENT, IMPROPER/ILLEGAL CONDUCT AND RETALIATION

76. Shortly after reporting these issues to Mr. Rich, Ms. Ward went on a pre-planned vacation.

77. When Ms. Ward returned to work at the Las Vegas BME office, it was obvious that something had occurred in her absence, as Mr. Andreas was even colder, more hostile and frequently screamed and slammed doors.

78. Disturbingly, Ms. Payton stated to Ms. Ward "I'm worried about you, because Don is going to make your life a living hell until you quit."

79. Approximately three to five days later, Mr. Rich spoke with Ms. Ward and informed her "something happened to Don."

80. Ms. Ward assumed this meant that Mr. Andreas had been reprimanded/sanctioned for his inappropriate behavior.

81. Ms. Ward informed Mr. Rich during this telephonic conversation that Ms. Payton and Ms. Friedman were also engaging in retaliation and that the office environment was exceedingly uncomfortable.

82. However, Mr. Rich made no mention was made of the retaliation engaged in by Ms. Friedman or Ms. Payton. Ms. Ward has no knowledge of any action taken on the issues complained about during the conversation.

83. On or about November 30, 2016, Ms. Castagnola locked everyone out of the BME investigative case counts. Mr. Andreas informed Ms. Payton that he had "given you guys too much freedom."

84. On or about December 21, 2016, Mr. Andreas informed Ms. Ward that he would now be reviewing all of her allegation letters and reiterated this requirement on January 3, 2016. However, no one else was subject to this requirement.

## DON ANDREAS AND PAM CASTAGNOLA SHOW A DISTURBING INTEREST IN MS. WARD'S DATING AND MEDICAL HISTORY

85. More than once, starting at least as early as November 2016, a member of a federal

law enforcement agency informed a friend of Ms. Ward's that Mr. Andreas and Ms. Castagnola were inquiring who Ms. Ward was dating.

86.  Ms. Castagnola referenced Ms. Ward's sexual harassment claim to a member of federal law enforcement and asked if someone who had filed a sexual harassment claim could be fired.

87.  Ms. Castagnola also improperly obtained and revealed to a member of federal law enforcement medical information related to Ms. Ward's recent gynecological surgical procedure further evidencing her bizarre and untoward fascination with Ms. Ward's sex and/or dating life.

**88.**  Ms. Castagnola and/or Don Andreas made certain that the fact of Ms. Ward's surgery was disseminated to the Las Vegas office staff and outside staff as well as those in outside agencies.

89.  In or about February 2017, Mr. Andreas took a photocopy of an image out of one of Ms. Ward's BME investigative files.

90.  The photo showed "Baby Stewie" from the cartoon series "Family Guy" with his hand balled up into a fist and a caption which stated *"Snitches get Stitches."*

91.  Mr. Andreas encountered Ms. Ward as she was walking to the water cooler and held the picture up to her and said "Look!" and then he giggled and smiled at her.

92.  Ms. Ward felt threatened by Mr. Andreas' insistence that she view the image because of the implicit threat of physical violence in the image. Further, his smiling and giggling were clearly not the result of a joke, even one in bad taste, but were malicious in nature.

### MS. WARD IS SUBJECT TO A CONCERTED PATTERN OF RETALIATION, HARASSMENT AND HAZING

93.  Despite reporting the harassment and intimidation and retaliation to her superiors, to Todd Rich and others, Ms. Ward has been subject to an ongoing campaign of harassment, intimidation, retaliation, disparate treatment and general hostility by those at the BME which included all of the above, as well as the following non-exhaustive list of retaliatory behaviors:

a. Keeping vital information from Ms. Ward, including but not limited to imminent arrival of co-workers from Reno, board meetings, and upcoming hearings;

b. Refusal to assign new cases to Ms. Ward, despite her repeated requests for the same;

c. Refusal to take messages related to Ms. Ward's cases;

d. Refusal to inform Ms. Ward when calls or messages were received on her cases;

e. Mr. Andreas knew that Ms. Payton and Ms. Friedman had refused to take messages, calls or otherwise document case activity for Ms. Ward's cases while Ms. Ward was on leave, as evident by Mr. Andreas' mocking behavior when Mr. Andreas inquired if Ms. Ward had received numerous calls/messages on her investigative cases during her absence. Due to Mr. Andreas' mocking behavior, Ms. Ward suspected, and later confirmed, that not only Mr. Andreas, but also Ms. Payton and Ms. Friedman at the behest of Mr. Andreas and or to please Mr. Andreas, were actively interfering with Ms. Ward's caseload, failed to note events in the computer system, refused to leave messages, refusal to note messages or information in the case file, take messages or otherwise cooperate, and were engaging in active sabotage of her cases;

f. Refusal to speak with Ms. Ward at the BME's Las Vegas office in a civil manner, including a refusal to say "hello", "good morning" or other professional courtesies;

g. Mr. Andres, Ms. Friedman and/or Ms. Payton tampering with Ms. Ward's food;

h. Inappropriate and intrusive inquiries as to Ms. Ward's health status;

i. Inappropriate and intrusive inquires by BME employees to outside agencies regarding who Ms. Ward may be dating;

j. Inappropriate and intrusive inquiries within the BME regarding who Ms. Ward may be dating;

k. Interference with Ms. Ward's investigations, to the point of excluding Ms. Ward from conversations with superiors regarding the same;

l.  Refusal to communicate with Ms. Ward regarding ongoing prosecution of investigative cases to which Ms. Ward was assigned;

m.  Mr. Andreas' elimination of "early days" in or about December 5, 2016, and his deliberate attempt to keep that information from Ms. Ward, so that, had Ms. Ward decided to take the early day as usual, Ms. Ward would have been reprimanded for leaving work early. Ms. Payton informed Ms. Ward about the "early day" change because she was afraid of Ms. Ward "getting into trouble because he [Don Andreas] didn't tell you we can't leave at 430." Thereafter, on or about December 6, 2016, Ms. Friedman announced to the office that Mr. Andreas had just texted her on her personal cell phone to inform her that he had misspoken and that early days were still permitted;

n.  Ms. Ward was required to call in sick to two supervisors when no one else at the BME was subject to this requirement;

o.  Contradictory requirements applied to her, and no others, in the event she needed to leave early, when others were not subject to these requirements;

p.  A requirement that Ms. Ward's cases be reviewed at the Las Vegas BME office's central conference table, when others were permitted to have their cases reviewed in their own offices instead of the open conference area;

q.  Being deliberately kept uninformed when other agencies were coming to the BME Las Vegas office in an attempt to make Ms. Ward look incompetent;

r.  Exclusion from normal office society;

s.  Requiring Ms. Ward, but not others, to actively seek information as to how investigative committees are proceeding on her cases when everyone else is simply provided this information without asking;

t.  Ms. Ward was repeatedly sent home early in lieu of having her discuss cases with certain BME Board Members;

u.  A requirement that Ms. Ward place her 'first draft' letters and complaints into the MLO computer system, when other investigators were permitted to re-write

and revise their first drafts, thereby ensuring that Ms. Ward's 'first draft' would appear to be a finished product; no one else was subject to this requirement;

v.   Increased scrutiny on Ms. Ward's work;

w.   The transfer of her high profile cases to other investigators;

x.   Numerous new "rules" which were communicated and applied only to Ms. Ward;

y.   Ms. Ward experienced significantly increased overt hostility in the office, not only from Mr. Andreas, but also from his compatriots, Ms. Friedman and Ms. Payton and eventually, from Ms. Castagnola; and

z.   Ms. Ward was subject to a caseload that was double, and in some cases, triple that of other investigators at the BME.

94.   Thereafter, the retaliation and harassment continued, despite Ms. Ward bringing the same to the attention of Ms. Castagnola, the Chief of Investigations, Mr. Rich, the Deputy Chief of Investigations and to Mr. Cousineau the Executive Director.

95.   In March 2016, Ms. Ward was written up for following Mr. Andreas, her direct supervisor's instruction.  Ms. Ward was ordered by Mr. Andreas to send a publicly available document to a Las Vegas attorney representing Allstate Insurance Company. Ms. Ward protested that she could not properly do so.  Mr. Andreas responded, "*Shut the fuck up.  I know what I'm doing.*"  Ms. Ward was ordered by Mr. Andreas to send the document despite her protests.  Thereafter, Ms. Ward informed Ms. Castagnola and Mr. Rich that she had been directly ordered to send the document by Mr. Andreas. However, despite the clear order from her immediate supervisor, Ms. Ward was reprimanded for sending the document.

96.   The pattern of harassment, retaliation and intimidation continues unabated.

**KIM FRIEDMAN MAKES FALSE CLAIMS ABOUT MS. WARD TO SUPPORT THE CAMPAIGN OF RETALIATION**

97.   On or about September 14, 2017, Ms. Friedman made a false and unsubstantiated claim that Ms. Ward harassed and/or threatened and/or intimidated her.

98. Ms. Ward believes this false and unsubstantiated claim was made in retaliation for Ms. Ward's complaints about Mr. Andreas and/or reporting the irregularities mentioned above, among others, to Mr. Cousineau and/or Mr. Rich.

99. In fact, Ms. Ward, who previously had been subject to bizarre, cruel, false, and otherwise improper actions by Ms. Friedman and others at the BME, recorded the incident on her cell phone.

100. The video recording obtained by Mr. Andreas from the BME, reflects that Ms. Ward did nothing untoward, rude, hostile, threatening or otherwise improper or imprudent towards Ms. Friedman regarding the encounter that occurred in the BME parking lot.

101. An audio recording of the incident also shows that Ms. Ward did nothing untoward, rude, hostile, threatening or otherwise improper or imprudent toward Ms. Friedman regarding the encounter that occurred in the BME parking lot.

102. On or about September 21, 2017, Ms. Ward was placed on administrative leave without anyone even asking her what happened during the supposed event with Ms. Friedman.

103. When Ms. Ward was placed on leave, Ms. Ward protested and offered to provide the audio recording of the incident to the BME, but such offer was declined.

104. Instead, the BME placed Ms. Ward on administrative leave, essentially painting her as the guilty party and causing irreparable harm to her previously stellar professional reputation.

105. Ms. Ward remains on administrative leave as of the date of filing of this Complaint.

106. After receipt of her "Right to Sue" letter from the Equal Employment Opportunity Commission ("EEOC"), Ms. Ward filed this Action.

### FIRST CAUSE OF ACTION
**(Unlawful Sex Discrimination in Violation of Title VII and NRS 613.330(1))**

107. Plaintiff incorporates all of the allegations in the preceding paragraphs as though fully set forth herein.

108. During the course of her employment at the BME, Ms. Ward was subject to an unwelcome vicious, extreme, outrageous, pervasive and unrelenting campaign of sexual

harassment by her supervisors Mr. Andreas and Ms. Castagnola.

109.     Ms. Ward voiced her complaints about this unwelcome vicious, extreme, outrageous, pervasive and unrelenting campaign of sexual harassment by Don Andreas.

110.     Immediately after Ms. Ward made the complaint, Mr. Andreas began a campaign of harassment, retaliation and intimidation that spread to include Ms. Payton, Ms. Friedman and Ms. Castagnola and others.

111.     Despite Ms. Ward reporting the behavior to Mr. Cousineau, the Executive Director, it did not stop. Thereby, the BME affirmed, ratified and acquiesced in the campaign of vicious harassment and hostile working environment.

112.     The Defendants' behavior violated 42 U.S.C. § 2000e-2(a) and NRS 613.330, by discriminating against Ms. Ward because of her sex, female.

113.     Because Defendants unlawfully discriminated against Ms. Ward by allowing Ms. Ward to be subjected to unwelcome harassment and hostile working environment because of her sex, female, Defendants must pay damages in an amount to be determined at trial for back pay, front pay, lost benefits, and compensatory damages for emotional pain, suffering, inconvenience, mental anguish and loss of enjoyment of life.

114.     Because Defendants are guilty of oppression, fraud or malice, express or implied, Defendants must pay Ms. Ward an additional amount for the sake of example and by way of punishment.

115.     Ms. Ward has had to obtain the services of an attorney to protect her rights and secure compensation for the damages incurred as a result of these violations of Title VII and therefore, she is entitled to recover reasonable attorney's fees against Defendants pursuant to 42 U.S.C. §2000e-5(k).

## SECOND CAUSE OF ACTION
### (42 U.S.C. §1983 Equal Protection)

116.     Plaintiff incorporates all of the allegations in the preceding paragraphs as though fully set forth herein.

117.     Defendants were acting under color of state law at all times described herein.

118.    As described herein, Defendants Don Andreas, Pamela Castagnola, Kim Friedman, Kati Payton, Todd Rich, and Edward Cousineau deprived Plaintiff of her right to equal protection by discriminating against her on the basis of her gender and creating a hostile work environment in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.

119.    Alternatively, Defendants deprived Plaintiff of her right to equal protection by irrationally and/or arbitrarily subjecting plaintiff to differential treatment for reasons unrelated to a legitimate governmental objective.

120.    Plaintiff should be awarded compensatory damages against Defendants for the stress, anxiety, pain, humiliation and trauma she has suffered in an amount to be determined at trial.

121.    Defendant's conduct was reckless and violated Plaintiff's clearly established constitutionally and statutorily protected employment rights, and therefore Plaintiff should be awarded punitive damages in an amount to be determined at trial.

122.    Plaintiff should be awarded reasonable attorney's fees and litigation costs and expenses including expert witness fees against Defendants pursuant to 42 U.S.C. 1988.

### THIRD CAUSE OF ACTION
**(Retaliation under Federal Law, 42 U.S.C. § 2000e-3 and Retaliation under Nevada Law, NRS 613.340)**

123.    Plaintiff incorporates all of the allegations in the preceding paragraphs as though fully set forth herein.

124.    Ms. Ward reported the sexual harassment and wrongful and/or unlawful conduct and retaliatory conduct as summarized above committed by Mr. Andreas, Ms. Payton, Ms. Friedman and Ms. Castagnola to Mr. Cousineau, the Executive Director; and/or to Mr. Rich, the Deputy Executive Director. However, nothing was done to stop the ongoing harassment, intimidation, and retaliation.

125.    Defendants subjected Ms. Ward to a vicious, extreme, outrageous, pervasive and unrelenting campaign of harassment and retaliation as a direct consequence of Ms.

Ward's opposition to prior harassment.

126.     Defendants subjected Ms. Ward to a vicious, extreme, outrageous, pervasive and unrelenting campaign of harassment and retaliation as a direct consequence of Ms. Ward's reporting of improper and likely illegal behavior to Mr. Cousineau, the Executive Director.

127.     The Defendants' behavior violated 42 U.S.C. § 2000e-3 and NRS 613.340.

128.     Because Defendants unlawfully retaliated against Ms. Ward because she engaged in protected activity in opposition to sexual harassment and improper and potentially illegal practices, Defendants must pay damages in an amount to be determined at trial for back pay, front pay, lost benefits, and compensatory damages for emotional pain, suffering, inconvenience, mental anguish and loss of enjoyment of life.

129.     Because Defendants are guilty of oppression, fraud or malice, express or implied, Defendants must pay Ms. Ward an additional amount for the sake of example and by way of punishment.

130.     Ms. Ward has had to obtain the services of an attorney to protect her rights and secure compensation for the damages incurred as a result of these violations of Title VII and therefore, she is entitled to recover reasonable attorney's fees against Defendants pursuant to 42 U.S.C. §2000e-5(k).

**FOURTH CAUSE OF ACTION**
**(Intentional/Negligent Infliction of Emotional Distress)**

131.     Plaintiff incorporates all of the allegations in the preceding paragraphs as though fully set forth herein.

132.     Defendants' conduct toward Plaintiff was extreme and outrageous and caused significant emotional harm, headaches, sleeplessness and various physical and mental distress.

133.     Defendants' conduct was extreme, outrageous, and undertaken with either intent or, reckless disregard for causing Plaintiff emotional distress.

134.     Defendants had a duty to refrain from engaging in the hostile and retaliatory acts

as described above.

135.    Defendants breached that duty.

136.    Defendants intentional or negligent conduct was the legal, actual, proximate cause of Plaintiff's extreme and/or severe emotional distress by engaging in the conduct described herein.

137.    Plaintiff is entitled to damages in an undetermined amount exceeding $10,000.00 because of the severe emotional distress inflicted on Plaintiff.

138.    Plaintiff is entitled to an award of reasonable attorney's fees.

### FIFTH CAUSE OF ACTION
#### (Negligent Supervision/Retention/Hiring)

139.    Plaintiff incorporates all of the allegations in the preceding paragraphs as though fully set forth herein.

140.    Defendants had an obligation to provide Ms. Ward with a workplace free of threat, harassment, retaliation, deprivation of her civil and constitutional rights, and defamation by her superiors and/or co-workers.

141.    Defendants studiously ignored Ms. Ward's multiple complaints regarding the retaliation and harassment she suffered.

142.    Defendants knew or should have known of its employees' proclivities for improper, unreasonable, outrageous, harassing and retaliatory actions such that an exercise of reasonable care would have stopped and or prevented such conduct.

143.    Defendants' failure to properly hire, supervise and or retain its employees and/or address this conduct in an appropriate manner caused injury to Plaintiff.

144.    Plaintiff is entitled to damages in an undetermined amount exceeding $10,000.00.

145.    Plaintiff is entitled to an award of reasonable attorney's fees.

### SIXTH CAUSE OF ACTION
#### (Defamation/Slander/Libel Per Se)

146.    Plaintiff incorporates all of the allegations in the preceding paragraphs as though

fully set forth herein.

147.   Defendants made false and defamatory statements of fact concerning Plaintiff, including but not limited to allegations that she engaged in hostile or threatening behavior.

148.   There was no justification or privilege for the publication of these statements to third parties.

149.   The Defendants knew or should have known that the statements were false and defamatory when made.

150.   At least one false and defamatory statement made by Defendants imputes criminal activity to Ms. Ward, and as such, constitutes defamation per se.

151.   At least one false and defamatory statement made by Defendants tends to injure Ms. Ward in her business or profession and constitutes defamation per se.

152.   Plaintiff has suffered damage to her reputation and has suffered harm that normally results from such defamation.

153.   Plaintiff suffered damages in an amount exceeding $10,000.00.

154.   Plaintiff is entitled to an award of reasonable attorney's fees in this matter.

155.   Defendants are guilty of oppression, fraud or malice, express or implied as Defendants knowingly defamed Plaintiff damaging her reputation, therefore Plaintiff is entitled to recover damages for the sake of example and by way of punishing the Defendants in an amount in excess of $10,000.00.

///

///

///

///

1   ///

2

3   ///

4          **WHEREFORE,** Plaintiff prays this court for:

5              a.   A jury trial on all appropriate claims;

6          and to enter judgment in favor of the Plaintiff by:

7              b.   Awarding Plaintiff an amount sufficient to fully compensate her (including tax

8                   consequences) for all economic losses of any kind, and otherwise make her

9                   whole in accordance with Title VII;

10             c.   An award of compensatory and punitive damages to be determined at trial;

11             d.   An award of attorney's fees and costs; and

12             e.   Any other relief the court deems just and proper.

13         Dated this _____ day of December, 2017.

14                                           **HKM EMPLOYMENT ATTORNEYS LLP**

15

16                                           _/s/. Jenny L. Foley_

17                                           **JENNY L. FOLEY, Ph.D., Esq.**
                                             Nevada Bar No. 9017

18                                           1785 East Sahara, Suite 325
                                             Las Vegas, Nevada 89104

19                                           Tel: (702) 805-8340
                                             Fax: (702) 625-3893

20                                           E-mail: jfoley@hkm.com
                                             _Attorney for Plaintiff_

21

22

23

24

25

26

27

28